# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Dawn P. L'Heureux, Charles J. Frederick, Jr., and Jennifer Biddle Frederick, | : | CASES CONSOLIDATED |
| Appellants | : | |
| | : | |
| v. | : | No. 1561 C.D. 2024 |
| | : | |
| West Chester Borough and High Street 410, LLC | : | |
| | | |
| Dawn P. L'Heureux, Charles J. Frederick, Jr., and Jennifer Biddle Frederick | : | |
| | : | |
| v. | : | No. 1578 C.D. 2024 |
| | : | Argued: February 3, 2026 |
| West Chester Borough and High Street 410, LLC | : | |
| | : | |
| Appeal of: High Street 410, LLC | : | |


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE STELLA M. TSAI, Judge


OPINION NOT REPORTED


MEMORANDUM OPINION BY
PRESIDENT JUDGE COHN JUBELIRER          FILED: May 28, 2026


Before the Court are cross-appeals filed by High Street 410, LLC (Developer) and Dawn P. L'Heureux, Charles J. Frederick, Jr., and Jennifer Biddle Frederick (Objectors) from an October 14, 2024 Order of the Court of Common Pleas of

Chester County (common pleas). The Order reversed a decision by Council (Council) for the Borough of West Chester (Borough) approving a preliminary land development plan submitted by Developer to develop a 128-unit multi-family building (Plan or Project). Developer argues common pleas erred in substituting its own interpretation of a building height requirement in the Borough's Zoning Ordinance[1] and by reversing instead of directing the Plan be processed in accordance with common pleas' interpretation of the building height calculation. Objectors argue common pleas erred in concluding the Plan satisfied certain parking and setback requirements. Upon review, we agree with common pleas that Council erred in applying the building height provision. We also agree with common pleas that Council did not err in applying the parking and setback provisions. Accordingly, we affirm common pleas' Order.

## I. BACKGROUND

Developer equitably owns a 1.332-acre property located at 410 South High Street (Property), which is situated between Dean and Price Streets in the Borough and is located in the Town Center (TC) Zoning District. (Council Resolution

---

[1] BOROUGH OF WEST CHESTER, PA., BOROUGH OF WEST CHESTER ZONING ORDINANCE, *as amended* (2021). Excerpts of the Ordinance appear in the Reproduced Record beginning at page 73a. A full copy of the Ordinance is part of the record that the Borough certified to common pleas in response to a writ of certiorari, which is docketed collectively as Item 6 of the Original Record. For ease of locating specific documents therein, we cite to the pagination of the pdf of the Original Record. Otherwise, we cite to the Original Record Item number. The Ordinance appears in the Original Record beginning at page 869. The West Chester Borough Subdivision and Land Development Ordinance (SALDO), BOROUGH OF WEST CHESTER, PA., BOROUGH OF WEST CHESTER SUBDIVISION & LAND DEVELOPMENT ORDINANCE, *as amended* (2018), appears in the Original Record beginning at page 1115. It requires that Council, when reviewing a preliminary plan, is to, among other things, "determine conformity of the application to the standards of this and any other applicable chapter," which would include the chapter containing the Ordinance. (SALDO § 97-13(B)(2)(b), Original Record (O.R.) at 1145.)

No. 2023-41 (Resolution), Reproduced Record (R.R.) at 115a; Application, Original Record (O.R.) at 95.) The Property was most recently a fast-food restaurant. On February 6, 2023, Developer submitted a Plan, which was revised a number of times, seeking to redevelop the Property into a 128-unit multi-family dwelling,[2] which is permitted by right in the TC Zoning District. (R.R. at 115a-16a.) Developer first presented the Plan at numerous meetings of the Borough's Planning Commission, which recommended preliminary approval by a vote of 4-3, subject to various conditions. (*Id.* at 32a.) The Plan was then presented to Council.

Through the application process, before both the Planning Commission and Council, Developer submitted numerous items in support of the Plan. Relevant for purposes of these appeals, Developer submitted a parking study prepared by John R. Wichner, P.E., PTOE.[3] Wichner indicated the Plan called for a total of 149 spaces, 122 of which were on the lower level of the building and 27 of which were "stacked."[4] (*Id.* at 36a.) Using the criteria for Dense Multi-Use Urban setting/location from the Institute of Transportation Engineer's (ITE) Parking Generation Manual, Wichner opined that the Project would demand 116-118 parking spaces depending on the parking demand. (*Id.* at 37a.) Therefore, according to

---

[2] Originally, Developer planned a mixed-use building with 9,200 square feet of commercial/retail space and 125 apartment units. (O.R. at 99.) In response to feedback from various entities, the retail space was removed and the Plan was ultimately revised to the 128-unit multi-family building, with 1,150 square feet being planned as amenities for residents, though Developer retained the right to convert it to retail space later provided Borough approval is obtained.

[3] A copy of the parking study appears in the Original Record starting at page 180 of the pdf.

[4] Wichner explained that the "stacked" spaces, or "bonus" spaces would be located behind available spaces for any resident who wanted an additional space. They "would allow for maneuverability by residents in individual units to prevent vehicles from being blocked." (O.R. at 180.) According to Wichner, the stacked spaces were not necessary to meet peak parking demand. (*Id.* at 181.)

3

Wichner, the Plan would provide sufficient parking to meet the anticipated demand. (*Id.* at 40a.)

Objectors provided their own parking study evaluation, which was prepared by John R. Caruolo, P.E. Caruolo did not take issue with Wichner's use of the ITE manual; rather, he claims that the Dense Multi-Use Urban setting/location was not appropriate. (*Id.* at 56a.) In Caruolo's opinion, that setting/location was not appropriate because "[t]he adjacent land use mix does **NOT** include office, retail, residential, and entertainment, hotel, and other commercial uses," "[t]here is **NO[]** or very limited on-street parking **or** off-street public parking," and "[t]he area is **NOT** 'served by significant transit (either rail or bus) that enables a high level of transit usage to and from the area development.'" (*Id.* (emphasis in original).) Instead, Caruolo opined that the "General Urban/Suburban" setting/location was more appropriate. (*Id.*) Using this setting/location, Caruolo stated 163 to 168 parking spaces would be required to serve the Project, more than what Developer proposed. (*Id.* at 57a.)

In response to Caruolo's letter, Wichner submitted a memorandum, disputing that Dense Multi-Use Urban setting/location required that there be office, retail, residential, entertainment, hotel, **and** other commercial uses. (*Id.* at 41a.) Wichner also disputed that there was no or very limited on-street or off-street public parking. (*Id.* at 42a.) Wichner pointed to permitted and non-permitted on-street parking and public parking garages and lots that were within walking distance of the Property. (*Id.*) Wichner also explained that on-street and off-street public parking was not needed to meet the parking demand. (*Id.*) Moreover, Wichner stated his study did not apply credits or reductions based on existing transit bus service and used the "no nearby rail transit" subset given the lack of such service. (*Id.*) Wichner asserted that

4

the Dense Multi-Use Urban setting/location was used in reports for two other projects in the Borough, both of which were approved. (*Id.*) Finally, Wichner stated the General Urban/Suburban setting/location used by Caruolo was not appropriate because, nearly all trips were not by passenger vehicle, the Borough's grid-system was not similar to the spaced-out intersections of suburban areas, most commercial buildings were not behind a parking area, retail use did not serve a regional clientele, service land use did not target motorists, and there was not a lack of pedestrian, bicycling, and transit facilities. (*Id.* at 42a-43a.)

On the issue of building height, Developer submitted a chart, which measured the height at 94 data points around the building, as well as a schematic showing where those data points corresponded on the building. (*Id.* at 11a-14a.) Based on Developer's calculations, the building height was 44.06 feet. (*Id.* at 13a.) Objectors submitted their own chart demonstrating how, in their opinion, Developer's calculations were flawed. (O.R. at 32-34.)[5] Based on their calculations, the building height was 47.66 feet, which exceeded the height limit for the TC Zoning District. (*Id.* at 34.)

Finally, in response to a letter from the Borough's planning and landscaping consultant, Developer explained how, in its view, the build-to line/front yard "matches existing adjacent setbacks." (*Id.* at 675.) Developer explained:

> The [] [P]roperty is located along the southern border of the . . . []TC[] Zoning District, and only has one [] existing adjacent property located within the same zoning district along the same side of S. High Street. The build-to[ ]line/front yards of adjacent properties in other zoning districts vary, and are vague and inconsistent as to how they might apply to the subject block. That existing adjacent property, located to

---

[5] Objectors submitted their own reproduced record, which is Appendix B of their brief. This chart also appears there beginning at page 3a. We will cite to the Original Record to avoid any confusion with Developer's Reproduced Record.

the north across Dean Street, has a build-to line/front yard of zero feet. Thus, the existing right-of-way line for S. High Street was utilized for the project build-to line/front yard setback consistent with the adjacent applicable build-to[ ]line.

(*Id.*)

Developer was subsequently asked again to provide clarification, and submitted another letter providing a detailed explanation as to how those were determined and comply with the Ordinance. Developer explained:

The 410 South High Street lot is trapezoidal in shape because Price and Dean Street do not intersect High Street perpendicularly. In order to place an orthogonal building on a trapezoidal lot, one of the frontages must be given primacy. High Street is the longest of the three street frontages. Therefore, the front of the building has been placed parallel to [] High Street. This results in triangular areas between the building and the street along both Price and Dean Streets.

On High Street the front of the proposed building is aligned with the buildings directly to the north of Dean Street. These buildings are also situated in the TC [Z]oning [D]istrict.

On Price Street, the southwest corner of the proposed building is aligned with the front porches of the houses to the immediate west (west of Boxwood Alley). From that point, a line was drawn to intersect High Street perpendicularly. This results in a large triangular area that is being used to provide [p]ublic [s]pace in the form of a "gateway plaza feature."

On the south side of Dean Street, the dominant structure which defines the "street wall/build[-]to line" is the stone wall/stockade fence which runs adjacent to the sidewalk for approximately 75 feet toward Clinton Alley[]. The base of the wall is located approximately nine feet [] from the cartway edge (face of the curb). When standing at the intersection of Clinton Alley and Dean Street looking eastward toward High Street, this structure defines the southern edge of the Dean Street viewshed.

The trapezoidal lot geometry condition on Dean Street is the reverse of Price Street: that is, the widest area (greatest width from the street) is at the northwest corner of the [P]roperty and the acute tip of the triangle is at the intersection of High and Dean Streets. Thus, the corner of the

6

proposed building is the closest to Dean Street near the intersection with High Street, where it is situated approximately 12 feet [] from the edge of the Dean Street cartway. At the northwest corner of the [P]roperty (heading toward Clinton Alley), the building is proposed to be over 27 feet from Dean Street cartway.

(R.R. at 46a.)[6]

Based upon the submissions, on December 20, 2023, Council adopted a Resolution, approving the Plan subject to 22 conditions it imposed.[7]

On January 18, 2024, Objectors filed their Notice of Land Use Appeal with common pleas. (O.R., Item 1.) Therein, Objectors argued the Plan should not have been approved because it did not comply with the building height restriction, minimum parking requirements, and the build-to/setback provisions. Objectors moved for a hearing to receive additional evidence or to refer the matter to a referee pursuant to Section 1005-A of the Pennsylvania Municipalities Planning Code (MPC), 53 P.S. § 11005-A,[8] which common pleas denied. (O.R., Items 3, 7.)

---

[6] An aerial photo of the Property depicting the proposed building and built-to/setback lines appears in the Reproduced Record at page 44a.

[7] The conditions are listed on pages 3 through 5 of the Resolution, which can be located in the Reproduced Record at pages 117a through 119a.

[8] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. § 11005-A. Section 1005-A was added by Section 101 of the Act of December 21, 1988, P.L. 1329, and provides:

> If, upon motion, it is shown that proper consideration of the land use appeal requires the presentation of additional evidence, a judge of the court may hold a hearing to receive additional evidence, may remand the case to the body, agency or officer whose decision or order has been brought up for review, or may refer the case to a referee to receive additional evidence, provided that appeals brought before the court pursuant to [S]ection 916.1[, added by Section 99 of the Act of December 21, 1988, P.L. 21, 53 P.S. § 10916.1,] shall not be remanded for further hearings before any body, agency or officer of the municipality. If the record below includes findings of fact made by the governing body, board or agency whose decision or action is brought up for review and the court does not take additional evidence or appoint a referee to take additional evidence, the findings of the governing body,

**(Footnote continued on next page…)**

Developer intervened in the appeal before common pleas and filed a "Petition Seeking an Order that [Objectors] be Required to Post Bond Pursuant to 53 P.S. § 11003-A[9] as a Condition Precedent to Proceeding with Appeal," which was also denied. (O.R. Items, 5, 13, 26.)

Following briefing, common pleas reversed Council's approval of the Plan. It concluded the proposed building's height exceeded the 45-foot limit, explaining the highest point of the flat roof on the proposed building was 47.61 feet above the average level of the finished grade at data point H56. (Common Pleas' Op. at 5-6.) It rejected Developer's calculation, reasoning that Developer did not use an average. (*Id.* at 6-7.) It also rejected Developer's contention that because it, the Borough zoning officer, Borough engineer, Borough solicitor, and Council interpreted the

---

board or agency shall not be disturbed by the court if supported by substantial evidence. If the record does not include findings of fact or if additional evidence is taken by the court or by a referee, the court shall make its own findings of fact based on the record below as supplemented by the additional evidence, if any.

53 P.S. § 11005-A.

[9] Section 1003-A was added by Section 101 of the Act of December 21, 1988, P.L. 1329. Section 1003-A(d) provides, in relevant part:

The filing of an appeal in court under this section shall not stay the action appealed from, but the appellants may petition the court having jurisdiction of land use appeals for a stay. If the appellants are persons who are seeking to prevent a use or development of the land of another, whether or not a stay is sought by them, the landowner whose use or development is in question may petition the court to order the appellants to post bond as a condition to proceeding with the appeal. After the petition for posting a bond is presented, the court shall hold a hearing to determine if the filing of the appeal is frivolous. At the hearing, evidence may be presented on the merits of the case. It shall be the burden of the landowners to prove the appeal is frivolous. After consideration of all evidence presented, if the court determines that the appeal is frivolous, it shall grant the petition for posting a bond. . . .

53 P.S. § 11003-A(d).

Ordinance as they did "does not make such a fact," especially when the language of the Ordinance is plain and clear. (*Id.* at 7.) Common pleas continued:

> [Developer] concedes that the proposed building is a single building. However, [Developer] has chosen to divide the single building into "sections" for purposes of calculating building height. [Developer] makes the untenable argument that if it is required to include measurements for the entire building in calculating height, it "would require inclusion and measurement of the air above section B of the building, where in fact no physical part of the building exists to which the height regulation could apply." . . . [Developer] continues by asserting that requiring the use of "the grade for [s]ection B to determine the height of [s]ection A would result in an unreasonable and absurd result." . . . . Although using the average level of the finished grade for the building, as mandated by the [Ordinance], does not produce the result desired by [Developer], it most certainly is not an unreasonable and absurd result. Adopting the position of [Developer] that a single building must be treated as two different parts or "sections[]" is contrary to the clear and unambiguous language of the [Ordinance] and would produce an unreasonable and quite absurd result.

(*Id.* at 9 (citations omitted).) Common pleas also rejected Developer's argument that the Ordinance was ambiguous and, therefore, should be construed in its favor, stating that parties reaching two different conclusions does not make the language ambiguous. (*Id.* at 10.)

Despite reversing Council's decision on the basis of the Plan exceeding the building height restriction, common pleas continued to address the other issues Objectors raised in their appeal. Common pleas rejected Objectors' argument that the Plan did not satisfy parking requirements. It reasoned the Ordinance "gives [Council] great latitude in deciding which engineering and/or expert reports to accept or dismiss," and the parking study submitted by Developer was accepted by Council. (*Id.* at 13.)

9

Common pleas similarly rejected Objectors' argument that the Plan did not satisfy build-to line/front yard requirements. It found the Property fronts three streets, and the proposed building matched the build-to lines on two sides. (*Id.* at 14.) As to the third side, common pleas declined to require the proposed building, which was located in the TC District, to match the setbacks of residential properties located in the adjacent Neighborhood Conservation-2 (NC-2) District. (*Id.* at 14.) Unlike the building height provision, common pleas found the setback provision was ambiguous as there were two reasonable interpretations of what it meant to "match adjacent setbacks." (*Id.* at 15.) Consequently, common pleas interpreted the ambiguous language in favor of Developer as landowner. (*Id.* at 17.)

Developer sought reconsideration of common pleas' October 14, 2024 Order, which was denied. (O.R. Items 29, 32.) Objectors filed a timely Notice of Appeal on October 25, 2024, and Developer filed a timely Notice of Appeal on November 8, 2024. (O.R. Items 30, 33.)[10]

## II. PARTIES' ARGUMENTS

On appeal,[11] Developer argues Council correctly interpreted the building height requirement. However, instead of giving Council's interpretation deference, Developer argues common pleas substituted its own judgment for that of Council. Developer argues utilizing the grade of one section of the building to determine the

---

[10] Common pleas directed both parties to file a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), Pa.R.A.P. 1925(b), which they did. Although common pleas issued an opinion pursuant to Rule 1925(a), it stated therein that its original memorandum opinion and order adequately addressed the issues raised and therefore it relied on its prior decision.

[11] In land use appeals where common pleas has not taken additional evidence, such as here, our review is limited to a determination of whether the governing body has committed an error of law or abused its discretion. *Koller v. Weisenberg Township*, 871 A.2d 286, 289 n.2 (Pa. Cmwlth. 2005).

height of another part of the building would create an unreasonable and absurd result; specifically, Developer maintains, the air above the shorter section of the building would need to be included. Developer asserts that Council's interpretation is consistent with that of the Borough's zoning officer, solicitor, and engineer. Even if the building height provision is ambiguous, which Developer denies, Developer argues the dispute must be resolved in its favor as the landowner to enable the least restrictive use of the Property.

Even if the Court were to accept common pleas' interpretation, Developer also argues that common pleas still erred in reversing Council's approval of the Plan because Developer can comply with common pleas' interpretation of the height restriction and should have been given the opportunity to do so. Developer asks the Court to reverse or modify common pleas' Order to provide that Developer may continue with the approved Plan provided any building permit plans meet common pleas' interpretation of the building height restriction.

Objectors argue common pleas correctly applied the clear and unambiguous language of the Ordinance as it pertains to building height and properly reversed Council's decision given the noncompliance with the Ordinance and the lack of a condition requiring such compliance. However, Objectors take issue with common pleas' holdings about parking and setbacks. Objectors contend common pleas misconstrued its argument about parking, which was based on the competency of Developer's expert. Specifically, Objectors assert Developer's traffic expert relied on facts not supported by the record and on flawed methodology because the expert used the wrong "setting/location" to establish parking load. According to Objectors, Developer's expert used the Dense Multi-Use Urban setting/location instead of the General Urban/Suburban setting/location, resulting in parking demand being

11

"substantially understated." (Objectors' Br. at 22.) Not only is there a lack of public transportation, which is typical of the Dense Multi-Use Urban setting/location, Objectors argue there is also a lack of on-street parking, another common characteristic. To the extent Developer's expert relied upon public parking garages within walking distance of the Property, Objectors argue the Ordinance requires off-lot parking to be adjacent to or directly across the street from the lot. Objectors assert

> it is incredulous to suggest that a multi-family dwelling building not served with on-street parking can satisfactorily meet the motor vehicle parking needs of the residents of 128 dwelling units (40% of which are two-bedroom units), community visitors and guests, minor commercial use and deliveries with only a theoretical maximum of 116 parking spaces, or less than one parking space per residential unit.

(*Id.* at 28.)

In relation to the setback requirement, Objectors argue common pleas created an ambiguity when one did not exist by adding language that did not appear in the Ordinance. In Objectors' view, "[t]he clear import of the Build-to[] Line set[]back is to match 'buildings on a block' and not 'match buildings on a block and located within the same zoning district,'" as common pleas interpreted it. (*Id.* at 40 (underscoring in original).) Objectors maintain the setback requirements are important to maintain "the traditional streetscape established by contiguous residential and commercial developments in the same corridor." (*Id.*)

As to the issues raised by Objectors in their cross-appeal, Developer responds that common pleas did not err on either issue. Developer argues the Dense Multi-Use Urban setting/location was appropriately used in calculating parking. Moreover, Developer points out that, at least twice, the same criteria were used for other projects within the Borough, both of which were approved. On the other hand,

12

Developer asserts, the criteria for the General Urban/Suburban setting/location proposed by Objectors are not present. Because there is substantial evidence to support Council's conclusion that there is sufficient parking to support the Plan, Developer asks the Court to affirm on this issue.

In relation to the build-to lines, Developer contends this requirement is also satisfied. Developer explains "to the extent adjacent blocks would be required to be 'matched' it is impossible to match varying setbacks on adjacent blocks and to the extent matching setbacks on other adjacent blocks is required, the [O]rdinance does not specify which adjacent setback should be matched." (Developer's Reply Br. at 9-10.) Thus, in Developer's view, the Ordinance is ambiguous, as common pleas found, and should be interpreted in Developer's favor as landowner. Accordingly, Developer maintains the Plan satisfies the setback requirements and the approval of the Plan should be affirmed on this basis.

## III. DISCUSSION

### A. *Building Height*

We begin with Developer's assertion that Council properly found the Plan satisfied the Ordinance's building height requirements and common pleas erred in reversing that decision. Developer and Objectors offer differing interpretations of building height, with Council adopting Developer's interpretation and common pleas accepting Objectors' interpretation. Developer and Objectors both assert the plain language of the Ordinance supports their respective interpretation. Developer, in the alternative, asserts that if the Ordinance is ambiguous, it must be interpreted in Developer's favor, as the landowner.

As the Court previously stated:

13

Like statutes, the primary objective of interpreting ordinances is to determine the intent of the legislative body that enacted the ordinance. *See* 1 Pa.C.S. § 1921; *Bailey v. Zoning Bd. of Adjustment of City of Phila.*, . . . 801 A.2d 492 ([Pa.] 2002); *Malt Beverages Distribs. Ass'n v. Pa. Liquor Control Bd.*, 918 A.2d 171 (Pa. Cmwlth. 2007) (en banc), *aff'd*, . . . 974 A.2d 1144 ([Pa.] 2009). In pursuing that end, we are mindful that a[n ordinance's] plain language generally provides the best indication of legislative intent. *Id.* Thus, statutory construction begins with examination of the text itself. *Id.*

In reading the plain language of a statute, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage." [Section 1903(a) of the Statutory Construction Act of 1972 (SCA),] 1 Pa.C.S. § 1903(a). . . . Where the words in an ordinance are free from all ambiguity, the letter of the ordinance may not be disregarded under the pretext of pursuing its spirit. [Section 1921 of the SCA,] 1 Pa.C.S. § 1921.

Thus, if we determine the ordinance provision at issue is unambiguous, we must apply it directly as written. *Bowman v. Sunoco, Inc.*, . . . 65 A.3d 901 ([Pa.] 2013); *see* 1 Pa.C.S. § 1921(b). However, if we deem the language of the ordinance ambiguous, we must then ascertain the legislative body's intent by statutory analysis, wherein we may consider numerous relevant factors. *Id.* An ambiguity exists when language is subject to two or more reasonable interpretations and not merely because two conflicting interpretations may be suggested. *Adams Outdoor Adver., L.P. v. Zoning Hearing Bd. of Smithfield Twp.*, 909 A.2d 469 (Pa. Cmwlth. 2006).

Further, "[w]hile it is true that zoning ordinances are to be liberally construed to allow the broadest possible use of land, it is also true that zoning ordinances are to be construed in accordance with the plain and ordinary meaning of their words." *Zappala Grp., Inc. v. Zoning Hearing Bd. of Town of McCandless*, 810 A.2d 708, 710 (Pa. Cmwlth. 2002).

*Tri-Cnty. Landfill, Inc. v. Pine Twp. Zoning Hearing Bd.*, 83 A.3d 488, 509-10 (Pa. Cmwlth. 2014).

Here, Section 112-309 of the Ordinance provides that the maximum building height in the TC Zoning District is 45 feet. (Ordinance § 112-309, O.R. at 922.)

Section 112-202 of the Ordinance defines "Height of Building or Structure," in relevant part, as "[t]he vertical distance measured from the average level of the finished grade along all the exterior walls of a building or structure to . . . [t]he highest point of the roof in case of a flat roof. . . ." (Ordinance § 112-202, R.R. at 88a, O.R. at 888.)[12]

To arrive at its building height calculation of 44.06 feet, Developer measured, in 10-foot intervals, the proposed building's elevation, the finished grade, and the highest point of the flat roof. In doing so, Developer split the proposed building into two sections, A and B. Section A's height is higher than section B's height. This breakdown was necessary, Developer posits, to avoid measuring the air above section B where no building exists. Objectors, on the other hand, utilize one roofline for all sides, regardless of whether the proposed building extends to that roofline in all places. Objectors add the values at all 94 data points together and then divide by 94 to create an average, which results in a calculated building height of 47.66 feet.

Council accepted Developer's calculation method, whereas common pleas reversed concluding Objectors' calculation method followed the plain language of the Ordinance. Based on the Ordinance's plain language, we agree that Objectors

---

[12] Section 112-202 of the Ordinance, "Height of Building or Structure" provides:

The vertical distance measured from the average level of the finished grade along all the exterior walls of a building or structure to:

A. The highest point of the roof in case of a flat roof.
B. The mean height between eaves and ridge in the case of a pitched roof.
C. The highest point of any structure which rises above the roofline and which floor area equals or exceeds 20% of the ground floor area of the building which supports it.

(Ordinance § 112-202, R.R. at 88a, O.R. at 888.) The Borough's SALDO also defines building height as such. (SALDO § 97-8, O.R. at 1127.)

15

and common pleas correctly calculated the building height. As stated above, for flat roofed buildings, the building height is determined by "[t]he vertical distance measured from the **average level of the finished grade along all the exterior walls** of a building or structure to . . . **[t]he highest point** of the roof. . . ." (Ordinance § 112-202 (emphasis added).) An average is determined by adding together all of the data points and then dividing by the number of data points. This yields one average grade. Similarly, there can be just **one** "highest point" of a building, from which the average grade is subtracted to yield the building height. Where Developer and Council erred was by separating the proposed building into two sections to account for the varying height. Consequently, the building's height, as calculated by Developer and accepted by Council was artificially reduced. While generally a court gives deference to a governing body's interpretation of its own ordinance, we need not do so when the interpretation does not follow the plain language of that ordinance. *City of Clairton v. Zoning Hearing Bd. of City of Clairton*, 246 A.3d 890, 909 (Pa. Cmwlth. 2021). Nor does Developer's interpretation create an ambiguity because its interpretation is not reasonable. Objectors illustrated why Developer's interpretation was not reasonable in its argument before common pleas:

> It is a reasonable exercise to take the [Developer's] errant methodology to calculate building height using averaging to its natural end point. Using the [Developer's] methodology to calculate building height, the [Developer] could reduce the portion of the building along Price Street by three floors (remaining structure being one floor) and thereby be permitted to increase the remainder of the building by one additional floor because of averaging; or even worse, yet, reducing a larger portion of the building to create a high-rise exceeding seven floors in one wing.

16

(O.R. at 1332.) As the Ordinance clearly and unambiguously provides the method for calculating a building's height, we need not interpret it in favor of the landowner. *Adams Outdoor*, 909 A.2d at 483-84.

Because Council erred in its interpretation of the Ordinance as it related to building height, we affirm common pleas' reversal on this issue. Developer also argues common pleas should have stopped short of reversing Council's approval of the Plan, stating Developer should have simply been required to comply with common pleas' interpretation of the building height requirement when applying for a building permit. While the Court has determined it is error to deny a plan when the defects "are correctable by fairly simple amendments to the documents," those were "defects in the plan notations and labels." *Shelbourne Square Assocs., L.P. v. Bd. of Supervisors of Twp. of Exeter*, 794 A.2d 946, 950 (Pa. Cmwlth. 2002). In the very same case, we determined there was a substantive planning issue related to access which was a legitimate reason for denying the plan and, accordingly, affirmed. *Id.* at 951. We agree with Objectors that compliance with the Ordinance's building height requirement is substantive, and not one that is correctable by "simple amendment." *Id.* at 950. This is particularly so when Council **approved** the Plan **without** conditioning it upon compliance with the Ordinance's building height requirement.

### B. Build-to Lines

We next turn to Objectors' assertion that Council erred by concluding the Plan complied with the Ordinance's requirements for build-to lines, as it similarly involves an issue of statutory construction.

17

Section 112-309 of the Ordinance provides that, in the TC Zoning District, the build-to line/front yard must "[m]atch existing adjacent setbacks."  (Ordinance § 112-309, O.R. at 922.)  A build-to line is defined as

> [a] line with which the exterior wall of a building is required to coincide that runs parallel to the property line, as measured perpendicularly to the curb or edge of a street cartway, that enables the alignment of buildings on a block in order to maintain the traditional character of the streetscape of the Borough.

(Ordinance § 112-202, O.R. at 878.)[13]

> The Ordinance defines "Yard, Front" as

> [a] yard abutting a street line of a primary street extending the full width of the lot along the front lot line of such yard and extending in depth from the front lot line to the building setback line. . . .  For lots fronting three streets, all yards abutting a street shall be considered a front yard. The remaining yard shall be either a rear yard or a side yard, determined by the position of the principle building façade.

(Ordinance § 112-202, O.R. at 909-10.)[14]

The Property is located in the TC Zoning District; the NC-2 Zoning District, which is residential,[15] is immediately adjacent to it.  The proposed building does not

---

[13] This definition is identical to the definition of "Build-To Line" in the Borough's SALDO. (SALDO § 97-8, O.R. at 1120.)

[14] The Borough's SALDO has a slightly different definition:

> A yard abutting a street line extending the full width of the lot along the front lot line and extending in depth from the front lot line to the building setback line.  In the case of a corner lot, the yards extending along all streets are "front yards" and the remaining yards shall include rear yard opposite the street on which the principal building is generally faced and a side yard opposite the other street.

(SALDO § 97-8, O.R. at 1140.)

[15] The Ordinance described the NC-2 Zoning District as being "designed to encompass the moderate- to high-density neighborhoods of the Borough, which comprise mixed type residences, including single-family and two-family detached, single-family and two-family semi-detached and **(Footnote continued on next page…)**

18

match the setbacks of the adjacent residential properties in the NC-2 Zoning District. Accordingly, Objectors argue the Ordinance's requirements are not satisfied. Developer, however, argues the Ordinance is ambiguous and, therefore, it is not obligated to match the setbacks of adjacent residential properties located in a different zoning district.[16]

"An ordinance's language is ambiguous where it 'is susceptible to more than one reasonable interpretation . . . or . . . is vague, uncertain, or indefinite.'" *Bethlehem Manor Vill., LLC v. Zoning Hearing Bd. of City of Bethlehem*, 251 A.3d 448, 465 (Pa. Cmwlth. 2021) (quoting *Kohl v. New Sewickley Twp. Zoning Hearing Bd.*, 108 A.3d 961, 968 (Pa. Cmwlth. 2015)). Unlike the building height definition, which is not ambiguous, the parties proffer two reasonable interpretations of the build-to line requirement. On the one hand, Objectors claim the Ordinance requires the setback of a proposed building must match adjacent setbacks, regardless of zoning district. On the other hand, Developer asserts, and Council and common pleas accepted, that the proposed building did not need to match adjacent setbacks

---

single-family attached." (Ordinance § 112-307, O.R. at 920.) It further provides that the NC-2 Zoning District "includes areas that are essentially built out and the primary development objective is to maintain the existing neighborhood qualities and streetscape characteristics." (*Id.* at 920-21.) As does the TC Zoning District, the NC-2 Zoning District also provides that the build-to line/front yard should "[m]atch existing adjacent setbacks." (*Id.* at 921.)

The Ordinance states the TC Zoning District "is designed to accommodate uses appropriate to the Central Business District . . . and to provide regulations to ensure that the scale and character of the historic and retail commercial environment is maintained." (Ordinance § 112-309, O.R. at 922.) It "is also designed to include regulations to encourage the provision of pedestrian amenities and protect the character of adjoining residential zoning districts." (*Id.*)

[16] The parties produced competing aerial photos depicting what they respectively deem the appropriate build-to lines. Developer's depiction is located in its Reproduced Record at page 44a and the Original Record at page 772. Although some of the streets shown on this diagram are labeled, neither Dean Street nor Price Street is labeled. Dean Street is to the left of the proposed building, and Price Street is to the right of the proposed building. Objectors' depiction is located in its Reproduced Record, which is appended to its brief, at 16a, and the Original Record at page 839.

19

of properties that were located in a different zoning district. Both are reasonable interpretations. The ambiguity is perhaps best illustrated by example with the build-to/setback line along South High Street. Developer's Plan shows the proposed building is aligned with a building to the north, across Dean Street. Objector's build-to/setback lines would align with residences to the south across Price Street in the NC District. Both are adjacent, and both have different build-to/setbacks. In this situation, it is unclear which "existing adjacent setback" should be matched.

As the Ordinance did not specify whether, in these circumstances, a plan should match the larger or the smaller setback, a developer can choose. This is consistent with the well-established legal principle that we must interpret any ambiguity in favor of the landowner, here Developer, to allow for the least restrictive use of its property. This is consistent with the MPC and case law. *See* Section 603.1 of the MPC, 53 P.S. § 10603.1;[17] *Bethlehem Manor*, 251 A.3d at 465; *Kohl*, 108 A.3d at 968.

Because the build-to line requirement is susceptible to two reasonable interpretations, it is ambiguous and Council did not err by interpreting it in favor of Developer and finding that the Plan satisfied the Ordinance's requirements.

---

[17] Section 603.1 was added by Section 48 of the Act of December 21, 1988, P.L. 1329. Section 603.1 provides:

> In interpreting the language of zoning ordinances to determine the extent of the restriction upon the use of the property, the language shall be interpreted, where doubt exists as to the intended meaning of the language written and enacted by the governing body, in favor of the property owner and against any implied extension of the restriction.

53 P.S. § 10603.1.

20

## C.    Parking

The final issue before the Court is whether Council erred in concluding the Plan satisfied the Ordinance's parking requirements. Objectors contend Developer's expert utilized the wrong standard and, consequently, underestimated the parking required to serve the Project. Developer responds that its expert utilized the correct standard and the Plan provides for sufficient parking under the Ordinance.

Section 112-603(A) of the Ordinance sets forth the requirements for parking spaces in the TC Zoning District, providing, in relevant part:

> Off-street parking shall be provided to meet the demand of the proposed land uses. The applicant shall calculate the demand based on accepted standards, such as those published in the [ITE's] Parking Generation Reports. . . . The number of off-street parking spaces provided will be determined by the Borough based on the information supplied by the applicant and such other information and studies as the Borough shall determine relevant.

(Ordinance § 112-603(A), R.R. at 114a, O.R. at 981.)

Both Developer's and Objectors' parking analyses utilize ITE standards, which is one of the standards identified in the Ordinance as appropriate. Developer presented a parking study prepared by Wichner, which utilized the Dense Multi-Use Urban setting/location from ITE's Parking Generation Reports to opine that 116 to 118 parking spaces were required to serve the Project's demand. (R.R. at 37a.) The Dense Multi-Use Urban setting/location is defined by ITE as:

> a fully developed area (or nearly so), with diverse interacting complementary land uses, good pedestrian connectivity, and convenient and frequent transit. This area type can be well-developed urban area outside a major metropolitan downtown or a moderate size urban area downtown. The land use mix typically includes office, retail, residential, and often entertainment, hotel, and other commercial uses. The residential uses are typically multifamily or single-family on lots no larger than one-fourth acre. The commercial uses often have

21

little or no setback from the sidewalk. Because the motor vehicle will still present the primary mode of travel to and from the area, there typically is on-street parking and often off-street public parking. The complementary land uses provide the opportunity for short trips within the Dense Multi-Use Urban area, made convenient by walking, biking, or transit. The area is served by significant transit (either rail or bus) that enables a high level of transit usage to and from the area development.

(O.R. at 181.)[18]

Objectors presented a report by Caruolo, who utilized ITE's General Urban/Suburban setting/location and concluded 163 to 168 parking spaces would be required to serve the Project. (R.R. at 57a.) The General Urban/Suburban setting/location is defined as:

an area associated with almost homogeneous vehicle-centered access. Nearly all person trips that enter or exit a development site are by personal passenger or commercial vehicle. The area can be fully developed (or nearly so) at low-medium density with a mix of residential and commercial uses. The commercial land uses are typically concentrated at intersections or spread among commercial corridors, often surrounded by low-density, almost entirely residential development. Most commercial buildings are located behind the parking area or surrounded by parking. The mixing of land uses is only in terms of their proximity, not in terms of function. A retail land use may focus on serving a regional clientele whereas a service land use may target motorists or pass-by vehicle trips for its customers. Even if the land uses are complementary, a lack of pedestrian, bicycling, and transit facilities or services limit non-vehicle travel.

(O.R. at 805.)

---

[18] ITE's manual is not part of the record. However, both parties' experts set forth the relevant definitions of the settings/locations used in their respective reports, which are part of the record. As the parties do not appear to dispute the accuracy of those definitions, the Court accepts the parties' recitation of those definitions as true.

22

Council accepted Developer's estimate of necessary parking, concluding the Plan satisfied the Ordinance's requirements, and common pleas affirmed on this issue. Preliminarily, the Ordinance provides Council great latitude in determining the appropriate amount of parking. Objectors do not seem to dispute this; instead they argue that the parking issue is not a weight or credibility issue, as common pleas seemed to view it, but is one that turns on the competency of the expert's opinion. We disagree. The competency challenge is, at least indirectly, tied to whose report Council credited and gave more weight.

Wichner submitted his initial opinion. In response, Caruolo submitted a report, explaining why the area was not appropriately considered Dense Multi-Use Urban but was General Urban/Suburban and provided what facts he maintained supported those opinions. Wichner, in turn, submitted another report, rebutting Caruolo's opinion and providing facts he asserted supported his opinion as to why General Urban/Suburban was not the appropriate setting/location and his selection of Dense Multi-Use was. For instance, Caruolo claimed there was no or very limited on-street or off-street public parking, (R.R. at 56a), which Wichner contested stating there was, (*id.* at 42a).

Council had both Wichner's and Caruolo's reports. Faced with competing facts to support opposing opinions, Council accepted Wichner's version, concluded the Plan satisfied the parking requirements, and approved the Plan. "[T]he local governing body is the ultimate fact-finder in a land use proceeding." *BR Assocs. v. Bd. of Comm'rs of Twp. of Upper St. Clair*, 136 A.3d 548, 554 (Pa. Cmwlth. 2016). Council, as fact-finder, is charged with resolving conflicts in evidence and making credibility determinations. *Id.* As the reviewing court, we are constrained to accept those findings. *In re Thompson*, 896 A.2d 659, 668 (Pa. Cmwlth. 2006).

23

Objectors raise numerous issues with Wichner's opinion, but Objectors appear to be assigning attributes to the Dense Multi-Use Urban setting/location that are not derived from or are broader than those set forth by ITE. The availability of on-street public parking is one such example. The ITE definition does not mandate on-street public parking, like Objectors contend but, rather, states that public parking "typically" exists. (O.R. at 181.) Similarly, Objectors interpret the definition as requiring all of the following uses: office, retail, residential, entertainment, hotel, and other commercial uses; however, the definition plainly states that "[t]he land use mix **typically** includes office, retail, [and] residential, and **often** entertainment, hotel, and other commercial uses." (*Id.* (emphasis added).)

Upon review of the record, we cannot conclude Wichner's opinion was incompetent and that Council erred in relying upon that opinion when it determined the Plan satisfied the required parking.

## IV. CONCLUSION

Based upon the foregoing, Council erred when it concluded the Plan did not exceed the building height restriction for the TC Zoning District. Common pleas properly applied the unambiguous definition and based on the measurements provided by Developer, determined the proposed building exceeded that height. However, like common pleas found, Council did not err in concluding that the Plan satisfied the build-to line/setback requirements and parking requirements.

24

Accordingly, we affirm common pleas' Order, which reversed Council's approval of the Plan based on building height, despite the Plan otherwise conforming to build-to line/setback and parking requirements.

_____

RENÉE COHN JUBELIRER, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Dawn P. L'Heureux, Charles J. Frederick, Jr., and Jennifer Biddle Frederick, | : | CASES CONSOLIDATED |
| | : | |
| | : | |
| Appellants | : | |
| | : | |
| v. | : | No. 1561 C.D. 2024 |
| | : | |
| West Chester Borough and High Street 410, LLC | : | |
| | : | |

| | | |
|---|---|---|
| Dawn P. L'Heureux, Charles J. Frederick, Jr., and Jennifer Biddle Frederick | : | |
| | : | |
| | : | |
| | : | |
| v. | : | No. 1578 C.D. 2024 |
| | : | |
| West Chester Borough and High Street 410, LLC | : | |
| | : | |
| Appeal of: High Street 410, LLC | : | |

# **O R D E R**

**NOW**, May 28, 2026, the Order of the Court of Common Pleas of Chester County, entered October 14, 2024, is **AFFIRMED**.

_____
RENÉE COHN JUBELIRER, President Judge